United States District Court
Southern District of Texas
**ENTERED**
August 17, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DUNCAN LITIGATION INVESTMENTS, LLC, | § § § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:19-CV-3094 |
| | § | |
| BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, A PROFESSIONAL CORPORATION, | § § § § | |
| Defendant. | | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This is a legal malpractice case arising out of the "litigation frenzy" spawned by the April 2010 explosion of the *Deepwater Horizon* drilling rig. *See In re Deepwater Horizon*, 745 F.3d 157, 161 (5th Cir. 2014); *see also Nguyen v. Watts*, 605 S.W.3d 761, 768–71 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) (providing factual background and partial rundown of resultant litigation). Plaintiff, Duncan Litigation Investments, LLC ("DLI"), helped finance tort litigation related to the *Deepwater Horizon* explosion as part of a joint venture that was later challenged as illegal in subsequent civil and criminal proceedings and collapsed. Defendant, the law firm of Baker, Donelson, Bearman, Caldwell & Berkowitz ("Baker Donelson"), represented DLI in the wake of the joint venture's collapse.

Pending before the Court are a motion for partial summary judgment filed by DLI and a motion for summary judgment filed by Baker Donelson. DLI's motion (Dkt. 43) is

**DENIED**, and Baker Donelson's motion (Dkt. 42) is **GRANTED IN PART AND DENIED IN PART**.

## I.       FACTUAL AND PROCEDURAL BACKGROUND

For purposes of resolving the pending motion, the Court considers the following facts set forth in the summary judgment record as true. While drilling the Macondo well in the Gulf of Mexico, the *Deepwater Horizon* rig exploded and sank in April of 2010, creating a gigantic and destructive oil spill that took nearly three months to cap. Numerous parties sued British Petroleum ("BP"), which leased the rig, and the other companies that were involved in drilling the well.

### A.  The joint venture and Hilliard's financing

Two Texas attorneys, Mikal Watts ("Watts") and Robert Hilliard ("Hilliard"), formed a joint venture ("the Watts/Hilliard venture" or "the venture") to file tort cases stemming from the *Deepwater Horizon* explosion and spill. (Dkt. 42-2 at pp. 6–7). Watts tapped Anders Ferrington ("Ferrington"), a Mississippi attorney with whom Watts and Hilliard had previously handled mass tort litigation involving formaldehyde exposure in FEMA trailers, to take the lead on signing clients up. (Dkt. 42-12 at p. 3). Hilliard did not have the liquid cash to pay his share of the upfront litigation expenses, so he approached a businessman named Max Duncan ("Duncan") and asked Duncan to invest in the litigation in exchange for a portion of the attorneys' fees. (Dkt. 42-2 at pp. 7–8).

The proposed arrangement between Hilliard and Duncan presented a potential legal and ethical problem: Duncan was not a lawyer, and Texas Disciplinary Rule of Professional Conduct 5.04 generally prohibits the sharing of legal fees with nonlawyers. In an attempt

to find a way to make the arrangement legally permissible, Hilliard retained two lawyers in June of 2010 to advise him as to a possible structure for the transaction. (Dkt. 42-4). Hilliard was eager to close the deal with Duncan; and he asked the transactional lawyers in a June 16, 2010 email to "fast track the finalization" of the transactional structure. (Dkt. 42-4 at p. 6). In response to Hilliard's fast-track request, the advising lawyers made a few tentative suggestions—such as having Duncan make a high-interest non-recourse loan to Hilliard in Louisiana or having Duncan extend funding to an entity in the District of Columbia—that were designed to employ other jurisdictions' usury and third-party litigation funding laws to avoid the application of Texas's ethical rules and laws. (Dkt. 42-4). However, the lawyers stressed that their tentative suggestions provided no guarantee of legality, and they emphasized to Hilliard the need for patience and caution. In an email sent on June 18, 2010, one of the lawyers warned Hilliard that he could not act too hastily, as "the wrong structure for this transaction actually has severe personal ramifications" that "could literally ruin your life." (Dkt. 42-4 at p. 3). The lawyer informed Hilliard to "please pursue every reasonable alternative structure for this transaction to mitigate, to the extent possible, the risk before pulling the trigger." (Dkt. 42-4 at p. 3).

In the end, before any sort of transactional structure was implemented, Hilliard took a $3.2 million "initial investment" from Duncan in the form of a personal loan. (Dkt. 43-5 at p. 4). Then, on July 6, 2010, Hilliard and Duncan signed a "Litigation Investment Agreement" ("LIA") whereby Duncan agreed to give Hilliard "up to Six Million Dollars" in exchange for half of Hilliard's "Total Return" on *Deepwater Horizon* cases. (Dkt. 42-5 at p. 2). Despite the advising transactional lawyers' suggestions that the deal be

consummated through out-of-state entities, Hilliard and Duncan created two Texas entities to facilitate the transaction; Duncan created DLI, while Hilliard created an entity called HMG, LLP ("HMG"). (Dkt. 42-5 at p. 2; Dkt. 42-2 at pp. 14–15).

Hilliard told Duncan in an email that he would "do all the lawyering for our team, you are solely responsible for the funding." (Dkt. 43-5 at p. 11). Although Duncan was the sole managing member of DLI, Hilliard hired the counsel to form DLI, appoint its registered agent, and secure its Employer Identification Number. (Dkt. 43-5 at pp. 8, 12–13). Hilliard told Duncan just before Duncan signed the LIA that everything was "buttoned up," which Duncan took to mean that Hilliard had ensured the legality of the fee-sharing arrangement. (Dkt. 43-5 at p. 17). Duncan did not hire an attorney of his own to examine the LIA or the structure of his transaction with Hilliard. (Dkt. 43-5 at p. 12).

While DLI, Hilliard, and HMG were parties to the LIA, Duncan individually was not. (Dkt. 42-5 at p. 2). Duncan transferred to DLI all of his rights concerning all payments made to Hilliard, both prior to DLI's creation and subsequent to it. (Dkt. 43-5 at pp. 4–8). As a result, the $3.2 million initial investment, which was a loan from Duncan to Hilliard, was now owed to DLI, which in turn owed it to Duncan. (Dkt. 43-5 at pp. 4–5).

The LIA included an arbitration clause. (Dkt. 42-5 at pp. 4–5). The arbitration clause provided that, in the event of a "dispute, claim or controversy between [DLI] and [Hilliard] with respect to [the LIA], the interpretation, performance, or breach thereof, or the rights of the parties with respect to any transaction contemplated hereunder[,]" each party would select one arbitrator and the parties' arbitrators would then select an umpire. (Dkt. 42-5 at p. 4). The clause further provided that "[a]ny determination by a majority of the arbitrators

[would] be binding and conclusive upon the parties[.]" (Dkt. 42-5 at p. 4). The clause stated that the arbitration proceedings would be "informal[;]" it gave the arbitrators "the power to fix all procedural rules relating to the arbitration proceeding" and placed minimal restrictions on their decision-making authority, requiring only that they "have experience in the resolution of commercial disputes" and make their decision "in writing, stating the reasons therefor." (Dkt. 42-5 at pp. 4–5). The LIA was governed by Texas law, and the LIA's arbitration clause was accordingly governed by the Texas Arbitration Act. (Dkt. 42-5 at p. 4). *See* Tex. Civ. Prac. & Rem. Code § 171.002.

## B. The rejections of the joint venture's claims and the federal fraud investigation

The Watts/Hilliard venture eventually became embroiled in widely publicized civil and criminal proceedings arising from the venture's *Deepwater Horizon* docket. In April of 2011, Watts figured prominently in a lengthy *New York Times* article about false claims filed with a $20 billion claims fund set up by BP to settle with Gulf Coast residents and businesses harmed by the *Deepwater Horizon* explosion and oil spill. (Dkt. 42-7). According to the article, numerous Gulf Coast residents attempted to file claims with the fund administrators only to discover that attorneys were already listing them as clients without their knowledge. (Dkt. 42-7). The article cited one of Watts's purported clients as a specific example:

> Tuan Do, who began working in the office [of a national nonprofit group] after being laid off from his job as a store clerk during the oil spill, listened to these stories while making his own way through the claims system.

> Late last year, he filed for a modest settlement, and like so many others, he has been waiting ever since. Two weeks ago, Mr. Do checked with the claims facility on his status. They said they could no longer discuss it with him.
>
> To his surprise, he found out that he now had a lawyer in Mr. Watts.
> Dkt. 42-7 at p. 5.

The article said that Watts claimed to have signed up 43,000 clients but that some of those clients "protested that they were not represented by him." (Dkt. 42-7 at pp. 3–4).

Duncan later testified that he began to have misgivings about the Hilliard/Watts venture even before the *Times* article was published. Duncan tried to sell his stake in the venture as early as December of 2010, just five months after he signed the deal with Hilliard, but "there was no longer any interest because of the amount of bad news coming out." (Dkt. 42-6 at p. 5). When Duncan tried to divest his interest in the Watts/Hilliard venture, the BP fund's claims administrators had already rejected about 26,000 claims filed by the venture, contending that the attorneys "[could not] possibly have consulted with" and "secured a knowledgeable retention agreement" from every one of the tens of thousands of people that they were claiming to represent. (Dkt. 42-2 at p. 17; Dkt. 42-12 at p. 5). Before they would pay the claims, the claims administrators required Watts and Hilliard to provide, for each purported client, both a copy of an engagement agreement and documentary proof that the agreement had been knowingly and willingly signed— paperwork and proof that Watts and Hilliard were mostly unable to locate. (Dkt. 42-2 at pp. 17–18). The claims administrators explained in a November 10, 2010 letter to Watts that they "need[ed] such formal individual confirmation" because they "ha[d] received notification from claimants and from the Department of Justice hotline concerning

complaints of unauthorized use of [claimants'] Social Security numbers." (Dkt. 43-3 at p. 219). The letter further clarified that the complaining claimants "ha[d] been unsuccessful in filing a claim electronically with the [BP claims fund] because their Social Security numbers ha[d] already been used to submit a claim." (Dkt. 43-3 at p. 219).

Since the BP fund was requiring proof that they could not present, Watts and Hilliard turned their attention to a related multi-district litigation proceeding ("MDL 2179" or "the MDL") in the Eastern District of Louisiana in which they had filed approximately 40,000 cases, enough to put Watts on the MDL's plaintiffs' steering committee. (Dkt. 42-12 at pp. 4–6). Hilliard proposed bundling all of the venture's 40,000 cases together and offering a global settlement to BP in the hope that BP would be motivated to "put it to bed today" and "clean[] out 40k [cases] from the MDL." (Dkt. 42-12 at p. 6). BP settled the MDL docket in March of 2012. (Dkt. 42-12 at p. 20). However, the MDL settlement, like the BP claims fund, entailed a stringent claims administration process; and by November of 2012 the venture had completed settlement claim packets for only 14 out of more than 40,000 supposed clients. (Dkt. 42-12 at p. 20). The Watts/Hilliard venture's *Deepwater Horizon* docket collapsed, and BP sued Watts in December of 2013 for filing fraudulent claims. (Dkt. 42-12 at p. 8).

Meanwhile, federal prosecutors in the Southern District of Mississippi convened a grand jury to investigate the Watts/Hilliard venture. Federal agents raided Watts's San Antonio office in February of 2013. (Dkt. 42-12 at p. 7). In June of 2013, Duncan hired Baker Donelson to represent him in connection with the grand jury investigation. (Dkt. 42-9). The grand jury subpoenaed Duncan in October of 2013 to testify and to "provide any

and all documents relating to and/or agreements between Max Duncan, Robert C. Hilliard, Robert C. Hilliard, LLP, Mikal Watts, Mikal C. Watts, P.C., Watts, Guerra, Craft, LLP, HMG LLP, Duncan Litigation Investments, LLC and the Deepwater Horizon Oil Spill and related Litigation." (Dkt. 42-8 at p. 4).

Duncan was not indicted, though some of the other people involved in the joint venture were. In September of 2015, Watts was indicted, along with employees of his law firm and two of Ferrington's employees, for mail fraud, wire fraud, and identity theft. (Dkt. 42-12 at p. 8). According to the Justice Department, the two Ferrington employees, rather than signing up thousands of clients, had done little more than pull names out of the phone book. (Dkt. 42-12 at pp. 7–8). One of the "clients," for example, died five years before the *Deepwater Horizon* sank. (Dkt. 42-12 at p. 7). Watts and his employees were acquitted; but the two Ferrington employees—one of whom, it turned out, had previously been convicted of filing fraudulent claims in a mass-tort case—were convicted on all counts. (Dkt. 42-12 at p. 8).

### C. The tolling agreement, Duncan's lawsuits, and the arbitration involving Duncan and Hilliard

During the federal criminal investigation, Duncan began looking into the possibility of suing Hilliard and Watts to recover his losses from investing in the venture. In June of 2014, Duncan, Hilliard, and Watts signed an agreement that tolled the statute of limitations "[w]ith respect to any and all claims or causes of action, known or unknown, relating to, arising out of, or in connection with, the *In re: Deepwater Horizon*, MDL-2179 litigation" until 60 days after one or more of the signatories withdrew from the agreement. (Dkt. 42-

10). Duncan was a party to the tolling agreement, but DLI was not. (Dkt. 42-10). Under the tolling agreement, written notices associated with the tolling agreement that were sent to Duncan were to be copied to the Baker Donelson partner who represented Duncan in connection with the federal grand jury investigation. (Dkt. 42-10 at p. 3).

In December of 2014, Duncan signed a formal engagement letter hiring Baker Donelson to bring a civil suit against Watts. (Dkt. 42-11). Duncan and DLI then sued Watts and his law firm in Texas state court in December of 2015. (Dkt. 42-12 at p. 8). Watts and his law firm obtained a summary judgment on a limitations defense, and that judgment was affirmed on appeal. (Dkt. 42-12).

After losing his suit against Watts, Duncan then hired his current counsel, and Duncan and DLI sued Hilliard and his law firm in Texas state court on February 13, 2018. (Dkt. 43-5 at p. 1). The case then proceeded to arbitration under the LIA's arbitration clause. (Dkt. 43-5 at p. 1). As described by the arbitration panel in its final award, Duncan and DLI asserted the following causes of action in the arbitration: (1) breach of contract; (2) violations of the Texas Securities Act ("TSA"); (3) mutual mistake of fact; (4) money had and received; (5) unjust enrichment; (6) promissory estoppel; (7) fraud/fraudulent failure to disclose/fraudulent inducement; (8) breach of fiduciary duty; and (9) negligent misrepresentation. (Dkt. 43-5 at p. 2). The panel stated that Duncan and DLI "sought, in the alternative, rescissory damages, other out-of-pocket damages, consequential damages, and punitive damages." (Dkt. 43-5 at p. 2).

### D. The arbitration panel's findings

The arbitration panel issued its unanimous final award on July 9, 2019. (Dkt. 43-5 at p. 27). The panel found that Duncan was entitled to recover his $5.8 million investment from Hilliard for breach of "a fiduciary duty or, at minimum, a duty of due care" but reduced Duncan's recovery by 45 percent on account of his contributory negligence. (Dkt. 43-5 at pp. 14, 25–27). The panel wrote that, considering Hilliard's statement to Duncan that he would "do all the lawyering" and Hilliard's role in the creation of DLI and the LIA, there was, "at the very least, confusion" as to whether Hilliard had invited Duncan to rely on him as his attorney during the creation of DLI and the LIA. (Dkt. 43-5 at p. 14). The panel further found that "Hilliard breached his duties to Duncan, either in representing him in the formation of [DLI and] the [LIA] or in failing to make clear that he was *not* acting as Duncan's counsel and advising him to get independent, disinterested counsel, and by representing to Duncan that he had 'buttoned up' the issue of the legality of sharing legal fees with a non-lawyer[.]" (Dkt. 43-5 at p. 25) (emphasis in the panel's opinion).

With respect to DLI, the panel denied recovery entirely. In its analysis, the panel determined that three claims belonged to DLI instead of Duncan: (1) a claim for breach of the LIA; (2) a claim for rescission of the LIA based on a mutual mistake of fact; and (3) a claim for rescission based on violations of the TSA, with the alleged "security" at issue being DLI's interest in the LIA. (Dkt. 43-5 at pp. 6–8). The panel found that all three claims were time-barred. (Dkt. 43-5 at pp. 6–8). When discussing the TSA claims, the panel noted that "DLI was not a party to (or third-party beneficiary of) any tolling agreement." (Dkt. 43-5 at p. 8). In a footnote added to its discussion of DLI's cause of action under the TSA, the panel further observed that it was "at a loss to understand why DLI was never included

in any of the tolling agreements, particularly given that it must have been clear to DLI's/Duncan's counsel that DLI was the owner of these important potential claims." (Dkt. 43-5 at p. 8). Three other equitable claims—unjust enrichment, money had and received, and promissory estoppel—were addressed by the panel as if belonging to both DLI and Duncan, and the panel dismissed those claims on the basis that such "equitable claims . . . are not available in a case in which there is an express contract that addresses the plaintiffs' right to obtain the promised benefit from the defendants." (Dkt. 43-5 at p. 16).

Although it dismissed DLI's claims for other reasons, the arbitration panel explicitly found that the LIA "was illegal" and "was prohibited under Texas law[.]" (Dkt. 43-5 at p. 18). The panel's statements about the LIA's illegality were not incidental observations; rather, the panel cited them as support for its finding that Duncan was contributorily negligent for not "do[ing] more due diligence" by hiring disinterested counsel to examine the deal with Hilliard. "Just as independent counsel advised Hilliard not to rush into this deal," the panel wrote, "disinterested counsel would likely have advised Duncan not to do this deal without undertaking a much more careful investigation of the risks involved and would likely have done a more careful job of investigating the legality of Hilliard's sharing legal fees with Duncan/DLI, revealing the illegality of the transaction under Texas law." (Dkt. 43-5 at p. 25). Moreover, the panel expressly rejected a contention that DLI "could enforce the [LIA], notwithstanding its illegality[,]" concluding that the lone cited case supporting that contention, *Atkins v. Tinning*, 865 S.W.2d 533 (Tex. App.—Corpus Christi 1993, writ denied), was "contrary to the greater weight of Texas authority and ha[d] not been followed by any other Texas case to address the subject." (Dkt. 43-5 at p. 18).

11 / 26

### E.  This case

On July 30, 2019, three weeks after the arbitration concluded, DLI sued Baker Donelson for legal malpractice in Texas state court. (Dkt. 1-2). Baker Donelson removed the case to this Court. (Dkt. 1). In its live pleading, DLI alleges that "limitations was the sole reason DLI failed to recover at arbitration." (Dkt. 1-2 at p. 4). Building on that allegation, DLI alleges that Baker Donelson committed malpractice "by (1) failing to procure a tolling agreement which protected DLI and (2) failing to advise DLI of the statute of limitations for its claims against [Hilliard]." (Dkt. 1-2 at p. 4).

Both parties have moved for summary judgment. DLI has moved for a partial summary judgment "on all elements of negligence except for a portion of DLI's damages." (Dkt. 43 at p. 8). Baker Donelson has moved for a summary judgment dismissing DLI's case against it. (Dkt. 42).

## II.  <u>SUMMARY JUDGMENTS</u>

Both parties have moved for summary judgment under Federal Rule of Civil Procedure 56. In deciding a motion for summary judgment, the Court must determine whether the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant's initial summary judgment burden depends on whether the movant will bear the burden of proof at trial. If the non-movant will bear the burden of proof at trial on an issue raised in a motion for summary judgment, then the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an

absence of a genuine issue of material fact. *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). The movant need not negate the elements of the non-movant's case. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). The movant may meet its burden by pointing out the absence of evidence supporting the non-movant's case. *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 312 (5th Cir. 1995). However, if the movant will carry the burden of proof at trial, as is the case when the movant is either the plaintiff or a defendant asserting an affirmative defense, then the movant can only carry its initial burden by establishing beyond peradventure all of the essential elements of its claim or defense. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

If the movant meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (citations omitted). In deciding whether a genuine and material fact issue has been created, the facts and inferences to be drawn from those facts must be reviewed in the light most favorable to the non-movant. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).

## III.   <u>ANALYSIS</u>

DLI has sued Baker Donelson for legal malpractice. To prove a legal malpractice claim in Texas, "the client must establish that: (1) the lawyer owed a duty of care to the

client; (2) the lawyer breached that duty; and (3) the lawyer's breach proximately caused damage to the client." *Rogers v. Zanetti*, 518 S.W.3d 394, 400 (Tex. 2017).

When a legal malpractice case arises from prior litigation, the plaintiff must prove that, had the defendant attorney conformed to the proper standard of care, the plaintiff would have obtained a more favorable result in the underlying litigation. *Id*. at 401. More particularly, when the plaintiff alleges that the defendant lawyer's negligence caused the plaintiff to lose the underlying case, Texas law requires proof that "but for the attorney's breach of duty, [the malpractice plaintiff] would have prevailed on the underlying cause of action and would have been entitled to judgment." *Id*. at 404 (brackets in *Rogers*). "The traditional means of resolving what should have happened is to recreate the underlying case"—a re-creation that is commonly called the "case-within-a-case" inquiry. *Id*. at 401. In that inquiry, "the actual result with the alleged misconduct or omission is compared to a hypothetical result the plaintiff claims would have occurred absent the misconduct or omission." *Starwood Management, LLC by and through Gonzalez v. Swaim*, 530 S.W.3d 673, 679 (Tex. 2017).

The prior litigation in this case was an "informal" arbitration proceeding in which the arbitrators were given broad power to "fix all procedural rules relating to the arbitration proceeding" and to resolve the dispute as they saw fit. (Dkt. 42-5 at pp. 4–5). So long as they did not attempt "to add to, alter or modify the terms and conditions of [the LIA] or to decide any issue which d[id] not arise from the interpretation or application of the provisions of [the LIA,]" the arbitrators were restricted only by the requirements that they "have experience in the resolution of commercial disputes" and make their decision "in

writing, stating the reasons therefor." (Dkt. 42-5 at pp. 4–5). Accordingly, even though the arbitration panel cited to Texas law for its rules of decision, the Court must examine the case-within-a-case inquiry solely through the prism of how the *panel* would have resolved the dispute absent the alleged malpractice, keeping in mind that the LIA allowed the arbitration panel to deviate from what Texas law would obligate a judge or jury to do. *See Hoskins v. Hoskins*, 497 S.W.3d 490, 495–96 & n.7 (Tex. 2016) ("The arbitration agreement in this case contained no restriction (either directly or indirectly) on the arbitrator's authority to issue a decision unsupported by the law. . . . The parties signed an agreement to arbitrate under the TAA, and that agreement contained no limitations on the arbitrator's authority beyond those enumerated in the statute.").

### A. DLI's claims for breach of contract, rescission on the basis of mutual mistake, unjust enrichment, money had and received, and promissory estoppel were never viable because the arbitration panel expressly found that the LIA was illegal.

The arbitration panel's opinion eliminates the need to try a case-within-a-case as to DLI's claims for breach of contract, rescission on the basis of mutual mistake, unjust enrichment, money had and received, and promissory estoppel. The panel's opinion makes clear that, even without Baker Donelson's alleged malpractice, the panel would not have allowed DLI to recover on those claims. As previously mentioned, the arbitration panel explicitly found that the LIA "was illegal" and "was prohibited under Texas law[.]" (Dkt. 43-5 at p. 18). The panel also expressly rejected a contention that DLI "could enforce the [LIA], notwithstanding its illegality[,]" concluding that *Atkins*, the lone cited case

supporting the contention, was "contrary to the greater weight of Texas authority and ha[d]

not been followed by any other Texas case to address the subject." (Dkt. 43-5 at p. 18).

"The general rule under Texas law is that no accounting or recovery of profits can

be had by one party to an illegal transaction against another." *Packard v. OCA, Inc.*, 624

F.3d 726, 730 (5th Cir. 2010) (quotation marks omitted) ("*Packard II*"). Texas "courts will

neither aid in the enforcement of an illegal executory contract, nor relieve from an illegal

contract, a party who has executed it." *Morrison v. City of Fort Worth*, 155 S.W.2d 908,

909 (Tex. 1941). "A party to a contract prohibited by law which has been executed by

delivery of property thereunder may not secure the aid of a court to recover said property

delivered under said contract. Rather the policy of the law is to leave the parties to such

executed, unlawful contract in the position in which they, by their voluntary acts, have

placed themselves." *Herrmann v. Lindsey*, 136 S.W.3d 286, 291 (Tex. App.—San Antonio

2004, no pet.) (brackets and quotation marks omitted) (collecting cases).

Under the principles cited above, claims for breach of contract are barred when the

contract at issue is illegal. *Roberts v. Lucas*, 388 S.W.2d 764, 765 (Tex. Civ. App.—Tyler

1965, no writ) ("It will require no citation of authority for the well established rule of law

that the courts will not grant relief to either party when an illegal contract is sought to be

enforced."); *see also Blaine v. Blaine*, 207 S.W.2d 989, 994 (Tex. Civ. App.—Dallas 1947,

writ ref'd n.r.e.) ("The proposition is universal that no action arises, in equity or at law,

from an illegal contract; no suit can be maintained for its specific performance, or to

recover the property agreed to be sold or delivered, or the money agreed to be paid, or

damages for its violation.") (quotation marks omitted). Generally, claims for rescissory

relief, unjust enrichment, money had and received, and promissory estoppel are also barred where a contract is void because of illegality. *Packard v. OCA, Inc.*, No. 4:05-CV-273, 2009 WL 3172106, at \*1–4 (E.D. Tex. Sept. 29, 2009) ("*Packard I*"), *aff'd by Packard II*; *see also Packard II*, 624 F.3d at 731 & n.4. Texas courts have held that this is especially true where a party must rely on the illegal contract as a basis for its recovery of the damages its seeks. *See Packard I*, 2009 WL 3172106 at \*1–4 (holding that "the test often used in determining whether a demand connected with an illegal transaction can be enforced is whether the party requires aid from the illegal transaction to establish his case.")  In its opinion, the arbitration panel gave no indication that it intended to deviate from general Texas law with regard to DLI's claims for breach of contract, rescission on the basis of mutual mistake, unjust enrichment, money had and received, and promissory estoppel to recover its losses from its involvement in an illegal transaction. By specifically finding that the LIA was illegal, prohibited, and unenforceable, the arbitration panel indicated that it would not allow recovery on those claims even in the absence of a limitations bar.

DLI argues that the arbitration panel would have allowed recovery on all of its contractual and equitable claims  because (1) the arbitration panel "found . . . that the [LIA] was still enforceable despite the illegality finding", (2) "illegality is an affirmative defense that must be pleaded . . . but Hilliard did not plead such a defense", and (3) even if the panel found the LIA to an illegal fee-splitting agreement, under the holding in *Truyen Luong v. McAllister*, No. 01-17-00198-CV, 2018 Tex. App. LEXIS 5998, 2018 WL 3651103, at \*3, \*4 (Tex. App.—Houston [1st Dist.] Aug. 2, 2018, pet. denied), it was still

entitled to pursue equitable remedies to recover its damages.   (Dkt. 48 at p. 18). The Court disagrees.

> ### i.    The LIA's validity and enforceability

DLI first contests the applicability of the general bar against enforcing illegal contracts by contending that the arbitration panel found that the LIA was valid and enforceable. DLI bases this contention on the section in the arbitration award in which the arbitration panel rejected DLI's claims for unjust enrichment, money had and received, and promissory estoppel. In its analysis, the panel stated that:

> Texas courts have held that equitable claims such as these are not available in a case in which there is an express contract that addresses the plaintiffs' right to obtain the promised benefit from the defendants. [Duncan and DLI] are seeking the same relief under these claims as they claim a right to recover under their breach of contract claims, i.e., the return of the funds they invested in the BP litigation. Accordingly, they cannot obtain a recovery under these equitable theories.
> Dkt. 43-5 at p. 16 (citations omitted).

DLI argues that the panel "rejected DLI's quasi-contract claims (unjust enrichment and money had and received) because their subject matter was already covered by a valid contract (i.e., the [LIA]). Thus, there is no question that the Panel would have found the Agreement to be a valid contract because it expressly said so in the Final Award." (Dkt. 48 at p. 18) (record citation omitted).

The Court disagrees. The arbitration panel rejected DLI's equitable claims because the LIA was "an express contract that addresse[d] the plaintiffs' right to obtain the promised benefit from the defendants." (Dkt. 43-5 at p. 16). But the panel never said

anywhere in its opinion that the LIA was a *valid* contract. To the contrary, the panel repeatedly referred to the LIA as "illegal" and "prohibited under Texas law[.]" (Dkt. 43-5 at pp. 17, 18, 25). Furthermore, the panel explicitly refused to follow *Atkins*, in which the Thirteenth Court of Appeals of Texas held that a fee-sharing agreement between a lawyer and a nonlawyer can be enforceable even if the agreement violates Texas Disciplinary Rule of Professional Conduct 5.04, so long as the agreement does not also violate the Texas barratry statute. (Dkt. 43-5 at p. 18). *See Atkins*, 865 S.W.2d at 536–37. According to the arbitration panel's opinion, *Atkins*—which the panel rejected as "contrary to the greater weight of Texas authority" and as "not [having] been followed by any other Texas case to address the subject"—had been cited in the arbitration proceeding to support the argument that "[DLI] could enforce the [LIA], notwithstanding its illegality." (Dkt. 43-5 at p. 18). The arbitration panel disagreed with that argument and found the LIA to be illegal and unenforceable.

In short, an express contract can also be an illegal contract, and the panel found that the LIA was both.

### ii. *Hilliard's failure to plead illegality*

Next, DLI contests the applicability of the general bar against enforcing illegal contracts by pointing out that Hilliard did not plead illegality as an affirmative defense in the arbitration. Citing *Hall v. White, Gegey, Meyer & Co., LPA*, 347 F.3d 576 (5th Cir. 2003), DLI argues that "a malpractice defendant cannot defend the case-within-a-case based on affirmative defenses that were required to have been pleaded but were not." (Dkt. 48 at p. 18). DLI's reliance on Hall is misplaced. In Texas, the defense of illegality is an

exception to the general rule that an unpled affirmative defense is waived. *Phillips v. Phillips*, 820 S.W.2d 785, 789 (Tex. 1991). "[I]f the illegal nature of the document to be relied upon or sought to be enforced is apparent from the plaintiff's pleadings, it is not necessary that illegality be specially pleaded by the defendant in order to rely upon it as a defense." *Id*. (quotation marks omitted); *see also Jefferson County v. Jefferson County Constables Association*, 546 S.W.3d 661, 666 n.4 (Tex. 2018) ("We have relaxed the pleading requirement when the illegal nature of the document to be relied upon or sought to be enforced is apparent from the plaintiff's pleadings.") (quotation marks omitted).

Furthermore, the fact that the LIA was illegal was not a surprise to DLI at the arbitration proceedings. In their live pleading in the arbitration proceeding, Duncan and DLI themselves described the LIA as "an unethical and illegal investment structure" and stated that "Texas law broadly prohibits lawyers from sharing legal fees with non-lawyers." (Dkt. 43-15 at pp. 1, 8–15). In other words, the illegal nature of the LIA was certainly apparent from DLI's pleadings, as DLI's pleadings specifically described the LIA as "unethical and illegal."

In any event, the arbitration was an "informal" proceeding at which the arbitrators had "the power to fix all procedural rules[.]" (Dkt. 42-5 at p. 5). The parties' arbitration agreement did not require the arbitrators to apply Texas procedural rules regarding the pleading of affirmative defenses in the first place.

### iii.    *DLI's reliance on the holding in* Truyen Luong v. McAllister

Finally, DLI argues that even if the panel found the LIA to an illegal fee-splitting agreement, under the holding in *Truyen Luong v. McAllister*, No. 01-17-00198-CV, 2018

Tex. App. LEXIS 5998, 2018 WL 3651103, at *3, *4 (Tex. App.—Houston [1st Dist.] Aug. 2, 2018, pet. denied), it was still entitled to pursue equitable remedies to recover its damages. The Court disagrees. DLI's reliance on this holding to support its equitable claims is misplaced and the facts of that case are distinguishable from those presented here. In *Luong,* a case also involving an illegal fee-splitting agreement, the court allowed the plaintiff to proceed with its equitable claims despite a finding the contract at issue was illegal because there was a genuine dispute of material fact as to whether Luong could "prove his claims for quantum meruit and unjust enrichment without relying on the void contract or any allegedly illegal acts on his part." *Id.* Thus, Luong's equitable claims were viable to the extent he could prove he performed uncompensated work without relying on the void contract or on any illegal act on his part. Id. at *4–*5. In contrast, here DLI performed only one act—it gave Hilliard money in exchange for a share of Hilliard's attorneys' fees from the BP litigation. The arbitration panel held this was illegal. Unlike Luong, DLI rendered no other services to Hilliard for which it could be compensated, and it must rely on the void contract for any basis of recovery in this action. Since the contract is void and enforceable, DLI would not have been able to pursue any equitable claims for damages related to this contract.

By specifically finding that the LIA was illegal, the arbitration panel made clear that, even without Baker Donelson's alleged malpractice, it would not have allowed DLI to recover on its claims for breach of contract, rescission on the basis of mutual mistake, unjust enrichment, money had and received, and promissory estoppel. Accordingly, Baker Donelson is entitled to summary judgment on DLI's causes of action for legal malpractice

stemming from its claims against Hilliard for breach of contract, rescission on the basis of mutual mistake, unjust enrichment, money had and received, and promissory estoppel.

### B. DLI's claims under the TSA might have been viable were it not for the limitations bar.

Neither party, however, is entitled to summary judgment on DLI's causes of action for legal malpractice stemming from its claims against Hilliard for violations of the TSA. As codified at the time of the arbitration, the TSA stated that "[a] person who offers or sells a security . . . by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, is liable to the person buying the security from him, who may sue either at law or in equity for rescission[.]" Tex. Civ. Stat. art. 581-33A(2) (now codified without significant change at Tex. Gov't Code § 4008.052). DLI sued Hilliard for rescissory relief under the TSA, alleging that the "security" at issue was DLI's interest in the LIA and that Hilliard made numerous false statements to induce Duncan, DLI's sole managing member, to purchase that interest. (Dkt. 43-5 at p. 8). Among Hilliard's alleged falsehoods were statements that "Hilliard and HMG, LLP could legally and ethically share fees with Duncan" and that the transactional lawyers hired by Hilliard "were making sure all rules [we]re complied with in structuring the transaction[.]" (Dkt. 43-5 at p. 8).

Although the arbitration panel dismissed all of DLI's claims as time-barred, its discussion of DLI's TSA claim, unlike its discussion of DLI's other claims, specifically mentions that "DLI was not a party to (or third-party beneficiary of) any tolling agreement." (Dkt. 43-5 at p. 8). In a footnote added to its discussion of DLI's cause of action under the TSA, the panel further observed that it was "at a loss to understand why DLI was never included in any of the tolling agreements, particularly given that it must have been clear to DLI's/Duncan's counsel that DLI was the owner of these important potential claims." (Dkt. 43-5 at p. 8). The Court finds that the arbitration panel's discussion indicates that the panel considered DLI's TSA claims to be "important potential claims" that could have been viable had it not been for the limitations bar.

The Court also finds that there are triable issues of fact regarding limitations on DLI's TSA claims that preclude summary judgment. Baker Donelson argues that limitations on DLI's TSA claims against Hilliard had run before Baker Donelson ever formed an attorney-client relationship with DLI, making Baker Donelson's alleged malpractice regarding those claims irrelevant. The argument has three steps: (1) limitations on DLI's TSA claims started to run in 2010, when DLI "knew, or through the exercise of reasonable diligence should have discovered, each of the[] misrepresentations or omissions" for which DLI sued Hilliard; (2) Baker Donelson did not start representing DLI until "December 2014, when [DLI] sent Duncan a new engagement letter broadening the scope of the representation[;]" and, accordingly, (3) any alleged malpractice by Baker Donelson necessarily took place outside of the TSA's three-year statute of limitations,

meaning that Baker Donelson's actions or omissions had no effect on DLI's TSA claims. (Dkt. 42 at pp. 22–31).

Baker Donelson has not established its argument as a matter of law. As to step one of Baker Donelson's argument, the arbitration panel's opinion does not unambiguously state that DLI's TSA claims accrued in 2010. Baker Donelson correctly notes that the panel stated that "Duncan was aware of concerns that BP clients might not be real by the end of 2010[.]" (Dkt. 43-5 at p. 3). However, in response DLI correctly points out that the arbitration panel, while discussing DLI's TSA claims, also stated that "there were sufficient facts known by Duncan, DLI's sole Managing Member, or knowable in the exercise of reasonable diligence, by the *end of 2013* that the 'clients' in the BP litigation were 'fake.'" (Dkt. 43-5 at p. 8) (emphasis added). While discussing DLI's TSA claims, the panel further stated that, for many of Hilliard's alleged misrepresentations, "Duncan's loss necessarily was known by *April 9, 2014* when Hilliard disavowed all interest in his joint venture with Watts." (Dkt. 43-5 at p. 8) (emphasis added). The record does not conclusively show that the arbitration panel would have found that DLI's TSA claims accrued in 2010.

Furthermore, as to step two of the argument, DLI correctly states that, although DLI and Baker Donelson did not sign a formal engagement letter until December of 2014, Duncan was represented by Baker Donelson in connection with the federal grand jury investigation beginning in June of 2013. (Dkt. 48 at pp. 20–21). The arbitration panel noted that fact, as well. When discussing Hilliard's "limitations defense as to the[] DLI causes of action[,]" the panel refused to allow DLI to use the doctrine of equitable tolling to negate Hilliard's limitations defense because "the doctrine of Equitable Tolling has not been

applied in a case when a party is represented by legal counsel, as was the case with Duncan at least as early as June 2013." (Dkt. 43-5 at p. 9). The arbitration panel's refusal to allow DLI to invoke the doctrine of equitable tolling because Duncan had hired Baker Donelson is at least some evidence that the panel considered Duncan's hiring of Baker Donelson to be the starting point of an attorney/client relationship between Baker Donelson and DLI. The record does not conclusively show that the arbitration panel would have found that DLI's relationship with Baker Donelson began in December of 2014.

Accordingly, the Court finds that there are triable issues of fact regarding how the arbitration panel would have resolved DLI's TSA claims if Baker Donelson's alleged malpractice had not occurred. Baker Donelson argues that the TSA claims would have been time-barred anyway, while DLI argues that it would have won its TSA claim but for Baker Donelson's alleged malpractice. The record does not conclusively establish either party's position.

## IV.   **CONCLUSION**

Baker Donelson's motion for summary judgment (Dkt. 42) is **GRANTED** as to DLI's malpractice claims stemming from its claims against Hilliard for breach of contract, rescission on the basis of mutual mistake, unjust enrichment, money had and received, and promissory estoppel. Baker Donelson's motion is **DENIED** as to DLI's malpractice claims stemming from its claims against Hilliard for violations of the Texas Securities Act.

DLI's motion for summary judgment (Dkt. 43) is **DENIED**.

SIGNED at Houston, Texas on August 17, 2022.

GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE