United States District Court
Southern District of Texas
**ENTERED**
January 30, 2023
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DUNCAN LITIGATION INVESTMENTS, LLC | § § § § | |
| *Plaintiff*, | § § | |
| v. | § § | CASE NO. 4:19-cv-3094 |
| BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, A PROFESSIONAL CORPORATION | § § § § § | |
| *Defendant.* | § § | |

**FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

This case was tried by consent of the parties in a bench trial before the Court. Plaintiff Duncan Litigation Investments, LLC ("DLI") and Defendant Baker, Donelson Bearman, Caldwell & Berkowitz ("Baker Donelson") appeared by and through their counsel of record. The Court, having carefully considered the evidence admitted at trial and the stipulations made on the record during the trial, now makes the following findings of fact and conclusions of law. *See* FED. R. CIV. P. 52. Any conclusion of law more properly characterized as a finding of fact is adopted as such, and any finding of fact more properly characterized as a conclusion of law is adopted as such.

**Findings of Fact**:

1. On April 20, 2010, the offshore oil rig Deepwater Horizon exploded and sank, resulting in a massive oil spill in the Gulf of Mexico. This legal malpractice case arises from litigation that was spawned by this incident. DLI helped finance tort litigation related to the explosion as part of a joint venture that was later challenged as illegal in subsequent civil and criminal

proceedings and collapsed. The law firm of Baker Donelson represented DLI in the wake of the joint venture's collapse.

2. Mikal Watts ("Watts"), an attorney, wanted to sign up a base of clients to bring claims against BP and others (the "BP litigation") related to the explosion. This required expending significant sums of money to fund a large client-recruitment campaign.

3. Watts sought additional investors who could help fund expenses associated with signing up large numbers of clients in exchange for a share of the resulting attorneys' fees, including fellow attorney Robert C. Hilliard ("Hilliard"). Hilliard agreed and caused Robert C. Hilliard LLP to enter into a joint venture agreement with Mikal C. Watts, PC.

4. Watts eventually claimed to have signed up approximately 40,000 clients in the BP litigation, consisting of people from Vietnam who worked to catch fish and seafood in the Gulf Coast and who were purportedly hurt by the oil spill.

5. Initially, Hilliard did not have the cash necessary to fulfill his financial obligations as part of the joint venture with Watts. In May 2010 Hilliard approached Max Duncan ("Duncan") a wealthy friend and sophisticated investor. Hilliard offered Duncan half of Hilliard's alleged share in the joint venture with Watts in exchange for Duncan advancing up to $6 million to pay for Hilliard's obligation to Watts.

6. The proposed arrangement between Hilliard and Duncan presented a potential legal and ethical problem: Duncan was not a lawyer, and Texas Disciplinary Rule of Professional Conduct 5.04 generally prohibits the sharing of legal fees with nonlawyers. Hilliard informed Duncan that because Duncan was not a lawyer, it may not be legal for him to invest in litigation and share in the attorneys' fees.

7. Hilliard and Duncan orally agreed that Duncan would first loan Hilliard an initial sum of $3,875,000; if Hilliard determined that Duncan could legally participate in the proposed transaction, then that money would count towards the total of $6 million that Duncan agreed to invest in the BP litigation, and if Hilliard determined Duncan could not legally participate, then Hilliard would consider that money to be a personal loan and repay it.

8. Hilliard retained his own transactional attorneys, Locke and Eisen, to advise him how to legally structure the proposed transaction.

9. Locke and Eisen advised Hilliard in June 2010 that they had serious concerns about the legality of Duncan forming a Texas-based LLC as a vehicle to invest in the BP litigation under the laws of either Washington DC or Texas, and Hilliard forwarded that correspondence to Duncan contemporaneously. The attorneys also stated in their opinion that Duncan should retain his own attorney in this matter.

10. Duncan made a loan of $3,875,000 to Hilliard and Hilliard and Duncan decided to proceed with investing in the BP litigation. Hilliard instructed his attorneys to form DLI, a Texas-based LLC, with Duncan as the sole owner and managing member, as the investment vehicle.

11. On July 1, 2010, DLI entered into a Litigation Investment Agreement ("LIA") with Hilliard and HMG, LLP, an entity Hilliard created to serve as DLI's counterpart to its investment in the BP litigation. Duncan individually was not a party to the LIA. Hilliard and HMG, LLP represented that they had been engaged to represent clients with claims against BP arising out of the BP litigation that had already been filed or will be filed. Pursuant to the LIA DLI agreed to pay up to $6 million in exchange for half of Hilliard's "Total Return" from the attorneys' fees awarded from the BP litigation claims. Duncan did not hire an attorney of his own to examine the legality of the LIA or the structure of his transactions with Hilliard.

12. Hilliard and Duncan treated the initial $3.875 million as applicable towards DLI's obligation to pay up to $6 million, and Duncan assigned the right to recoup that amount to DLI. Duncan thereafter caused DLI to invest $1,847,875 by October 2010, with Duncan as the source of DLI's funds.

13. The LIA included an arbitration clause. The arbitration clause provided that, in the event of a "dispute, claim or controversy between [DLI] and [Hilliard] with respect to [the LIA], the interpretation, performance, or breach thereof, or the rights of the parties with respect to any transaction contemplated hereunder[,]" each party would select one arbitrator and the parties' arbitrators would then select an umpire. The clause further provided that "[a]ny determination by a majority of the arbitrators [would] be binding and conclusive upon the parties[.]"

14. John Cracken, an attorney, also invested in Watts's docket of plaintiffs in the BP litigation.

15. Duncan subsequently told federal prosecutors that regarding his investment in the BP litigation, "from October/November 2010 through 2012, everyday things got more desperate."

16. Duncan knew the following by the end of 2010:

- Neither Hilliard nor HMG, LLP had attorney-client contracts with any of the purported BP litigation plaintiffs.

- In November 2010, Feinberg, the Gulf Coast Claims Facility (GCCF") administrator, expressed that he did not think there were tens of thousands of Vietnamese fishermen working in the Gulf Coast. Feinberg had also received dozens of complaints from potential claimants, and from the Department of Justice, that the potential claimants were unable to file claims because Watts had already used their social security number to submit claims on their behalf even though Watts did not represent them. The GCCF had already rejected about 26,000 claims filed by the joint venture, contending that the attorneys "[could not] possibly have consulted with" and "secured a knowledgeable retention agreement" from every one of the tens of thousands of people that they were claiming to represent.

- In December 2010, Cracken hired consultants and personally visited Mississippi to conduct "field diligence." Cracken concluded that Watts's litigation team "[doesn't] have 41k clients" but, instead, "a list of 41k names."

17. By the end of March 2011 the following had also occurred:

- On January 21, 2011, Hilliard forwarded to Duncan an email he had sent to Watts characterizing the 40,000 clients as "ghosts in the wind."

- On January 23, 2011, Hilliard forwarded to Duncan an email from Cracken, who said the client database included "bad" phone numbers and addresses, some of the names came from a phone book, some of the fee contracts were duplicated, some of the clients claim they were duped into signing up with Watts, and others were either at sea or otherwise unavailable.

- On January 25, 2011, Cracken exchanged emails with a Vietnamese consultant hired to investigate the BP docket. Cracken observed that the consultant did not believe there were 40,000 Vietnamese deckhands in the Gulf in April 2010, and that Watts's law firm was in danger of being branded a predatory law firm. Duncan was forwarded a copy of this exchange.

- On March 9, 2011, when it became known that one of Watts's purported clients had died five years earlier, Cracken emailed Watts "Mikal, Fraud." Duncan was forwarded this email exchange.

18. On April 18, 2011, The *New York Times* published an article regarding numerous Vietnamese households who received letters signed by Watts, despite the fact they had not retained him and some of whom had not even been affected by the oil spill.

19. DLI continued to learn negative information about Watts's docket in 2011 and 2012.

20. Federal prosecutors in the Southern District of Mississippi eventually empaneled a grand jury to investigate the Watts/Hilliard venture, and federal agents raided Watts's San Antonio office in February 2013.

21. Duncan hired Baker Donelson criminal defense attorney Michael Dawkins in June 2013 to represent him, individually, in connection with the grand jury investigation. Baker Donelson informed Duncan in the engagement letter he was the client and that the scope of representation was limited to the grand jury investigation. Duncan did not hire Dawkins to represent DLI. DLI was never indicted, was never the subject of the grand jury investigation, and never received a subpoena for its documents or for the deposition testimony of a corporate representative. At all times DLI remained a corporate entity legally separate and apart from Duncan. DLI was never Dawkins's client.

22. In September 2013 Dawkins defended Duncan in his proffer of testimony to federal prosecutors. Also in September 2013, the grand jury issued a subpoena for documents directed to Duncan not DLI. Ultimately Watts and members of his litigation team were indicted on criminal fraud charges for, among other things, "fabricating thousands of clients" as part of the BP litigation. Duncan was not indicted.

23. During the federal investigation Duncan began looking into the possibility of suing Hilliard and Watts to recover his losses from investing in BP litigation.

24. As part of his representation of Duncan in the criminal investigation, Dawkins informed Duncan of the need for tolling agreement to protect any civil claims Duncan might have against Watts or Hilliard. Duncan did not ask Dawkins or Baker Donelson to represent DLI with respect to this tolling agreement. Neither Dawkins nor Baker Donelson represented DLI with respect any tolling agreement. Any legal services that Dawkins performed with respect to the tolling agreement was for his representation of Duncan individually not DLI.  Any belief by Duncan that Dawkins performed or should have performed legal services on behalf of DLI was objectively unreasonable. Any belief by Duncan that Dawkins represented DLI was objectively unreasonable. At all times DLI remained a corporate entity legally separate and apart from Duncan. Duncan told Dawkins in April and

May of 2014 that David Berg, an attorney in Houston, was handling the drafting of a tolling agreement.

25. On January 10, 2014, Berg hosted a conference call with Dawkins, Hilliard's criminal defense lawyer, and another lawyer in Berg's firm, in which Berg advised the statute of limitations for a breach of contract and fraud claim against Watts would likely run by April 20, 2014. This advice was circulated by an attorney in Berg's firm directly to Duncan and Hilliard.

26. In June of 2014, Duncan, Hilliard, and Watts signed an agreement that tolled the statute of limitations "[w]ith respect to any and all claims or causes of action, known or unknown, relating to, arising out of, or in connection with, the [BP litigation] until 60 days after one or more of the signatories withdrew from the agreement. DLI was not a party to the tolling agreement. Under the tolling agreement, written notices associated with the tolling agreement that were sent to Duncan were to be copied to Dawson. All of Dawson's legal services regarding this tolling agreement were on behalf of Duncan individually not on behalf of DLI.

27. In December 2014, Duncan met with Karen Smith and Brad Chambers in Baker Donelson's Houston office to consult with them about the possibility of asserting civil claims to recoup his lost investment in the BP litigation.

28. In December 2014, Baker Donelson sent Duncan a new engagement agreement, expanding the scope of representation to include asserting civil claims against Watts, and opened a new file internally for the matter. Duncan and Baker Donelson understood that both Duncan and DLI were Baker Donelson's clients under this agreement.

29. DLI ultimately authorized the filing of the lawsuit against Watts and his law firm on December 18, 2015, asserting causes of action for breach of contract, promissory estoppel, multiple theories of fraud, negligence, gross negligence, and negligent misrepresentation. Watts and his law firm obtained a summary judgment on its limitations defense to this action.

30. DLI appealed the grant of summary judgment, but the court of appeals affirmed, holding that "Duncan was repeatedly warned throughout the investment period—from June 2010 until July 2012—that a significant portion of the purported 40,000-plus clients were not legitimate," and that by March 2011, DLI knew or should have known that a "fraud" had been perpetrated by the field team responsible for signing up clients.

31. Duncan and DLI retained the law firm of Meade & Neese LLP to bring claims against Hilliard.

6

32. All parties moved to compel arbitration pursuant to the LIA's arbitration clause, and the dispute was referred to binding arbitration.

33. Duncan and DLI asserted claims for breach of contract, fraud, mutual mistake, unjust enrichment, violations of the Texas Securities Act, money had and received, promissory estoppel, breach of fiduciary duty, and negligent misrepresentation.

34. The arbitration panel held a final hearing, at which both sides presented their documentary evidence and witness testimony.

35. After the final hearing, and after receiving the parties' post-hearing briefs, the panel issued its final award.

36. The panel held among other things, that (1) the LIA was illegal, void, and unenforceable and (2) certain of DLI's claims were not protected by the Tolling Agreement and were barred from being asserted by the applicable statute of limitations.

**Conclusions of Law:**

1. DLI has brought this action against Baker Donelson for legal malpractice. DLI alleges that because of Baker Donelson's professional negligence, DLI was not included as a party to the Tolling Agreement and therefore DLI was barred by the applicable statute of limitations from bringing valuable claims against Hilliard in arbitration. To prevail on its malpractice claim, DLI must establish that Baker Donelson owed DLI a duty, did not meet the standard of care required of its attorneys under the circumstances, and that but for such alleged negligence, DLI would have obtained (and collected upon) a more favorable judgment in its underlying arbitration against Hilliard. *Green v. McKay*, 376 S.W.3d 891, 898 (Tex. App.—Dallas 2012, pet. denied); *Akin, Gump, Strauss, Hauer & Feld, LLP v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 112 (Tex. 2009).

2. Baker Donelson owed no duty to DLI at the time of the tolling agreement was negotiated and executed. As of June 2014, Baker Donelson, through Dawkins, only represented Duncan individually not DLI, a separate legal entity. Baker Donelson did not begin to represent DLI or owe it any legal duty until December 2014. Any legal services performed by Baker Donelson before December 2014, whether in connection with the grand jury investigation or the tolling agreement were for Duncan individually. The fact that Dawkins may have been told that DLI paid an invoice for legal services provided to Duncan did not create a duty between Baker Donelson and DLI. The testimony of DLI's expert at trial regarding the existence of a duty is not

supported by clearly established Texas law. In the absence of any duty, DLI has no claim for legal malpractice against Baker Donelson. *Green v. McKay*, 376 S.W.3d at 898.

3. Baker Donelson is entitled to judgment in this action.

SIGNED at Houston, Texas this 30th day of January, 2023.

*George C. Hanks Jr.*
GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE